IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CR-218-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| ANTONIO AUBREY GREENE | ) | |

This matter came before the court for sentencing and motion hearing on October 6, 2020. The court memorializes herein reasons for denying defendant's motion to withdraw his guilty plea and granting defendant's oral motion to amend his plea agreement. The court also expounds upon certain oral determinations regarding defendant's advisory guideline sentencing range made at time of sentencing. In particular, the court overruled pro se defendant's objection to his designation as a career offender, under United States Sentencing Guidelines Manual ("U.S.S.G.") § 4B1.1(a), and his oral objection to his two-level offense increase for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, under U.S.S.G. § 2D1.1(b)(12).

## BACKGROUND

Indictment filed June 6, 2018, charged defendant with the following four counts: 1) distribution and possession with intent to distribute a quantity of cocaine base (crack), and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2,[1] ("Count One"); 2) distribution and possession with intent to distribute a quantity of cocaine base (crack) in violation

---

[1] Due to a scrivener's error, as part of Count One, the indictment charges a violation of 21 U.S.C. § 841(a)(2) in addition to 21 U.S.C. § 841(a)(1). However, the plea agreement correctly notes that Count One charges a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

of 21 U.S.C. §841(a)(1) ("Count Two"); 3) distribution and possession with intent to distribute a quantity of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1) ("Count Three"); and 4) maintaining a place for the purpose of manufacturing, distributing and using controlled substances in violation of 21 U.S.C. § 856(a)(1) ("Count Four").

On December 13, 2018, defendant pleaded guilty, pursuant to a written plea agreement, to Count One. On September 15, 2020, defendant moved to withdraw his guilty plea under the written plea agreement in order, instead, to plead guilty, without a plea agreement, to the four counts in the indictment. At hearing, defendant asserted that his previous counsel had failed to inform him about the inclusion of a "cooperation agreement" in the plea agreement and about the implications of the plea agreement on his potential sentence, specifically his designation as a career offender.

Further, prior to sentencing, the United States Probation Office prepared and subsequently amended a Presentence Investigation Report ("PSR"), which calculated defendant's criminal history as a level VI and a total offense level of 29, which yields an advisory guideline sentencing range of 151 to 188 months.

Pertinent here, the probation office calculated defendant's total offense level by beginning with a base offense level of 22, determined pursuant to U.S.S.G. § 2D.1. The probation office calculated defendant's adjusted offense level as a 24 after a two-level increase for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, pursuant to U.S.S.G. § 2d1.1(b)(12). Defendant's offense level was further adjusted upwards to a 32, under U.S.S.G. § 4B1.1(b)(3), because defendant was at least 18 at the time of the instant offense, the instant offense was a controlled substance offense, and the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense: a 2015 conviction for

2

possession with intent to sell or deliver cocaine and a 1998 conviction for second-degree murder. Defendant received a total three-level reduction under a combination of U.S.S.G. § 3E1.1(a) and (b), resulting in a total offense level of 29. At sentencing, the court denied defendant's motion to withdraw his guilty plea and granted his later oral motion to amend his plea agreement by striking paragraphs I through K.[2] In addition, the court sentenced defendant to a term of imprisonment of 136 months.

## COURT'S DISCUSSION

A.      Motion to Withdraw Guilty Plea

"An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement." Fed. R. Crim. P. 11(c)(1). "If the defendant pleads guilty . . . , the plea agreement may specify that an attorney for the government will," among other things, "not bring, or will move to dismiss, other charges" or "agree that a . . . particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply." Id. "To the extent the plea agreement is" one which specifies the dismissal or dropping of charges or which stipulates to certain sentencing dispositions, "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Id. 11(c)(3)(A). "If the court accepts [this type of] plea agreement, it must inform the defendant that . . . the agreed disposition will be included in the judgment." Id. 11(c)(4). The court must also place the defendant under oath and "address the defendant personally in open court . . . [to] inform the defendant of, and determine that the defendant understands," the various ramifications of the plea agreement and that the

---

[2] The court also noted, sua sponte, a scrivener's error that resulted in the plea agreement stating that only Counts Two and Three would be dismissed despite the government's oral motion at defendant's December 13, 2018 arraignment to dismiss all of the counts except Count One. The court amended the plea agreement to accurately reflect such.

3

Case 5:18-cr-00218-FL   Document 73   Filed 10/14/20   Page 3 of 15

defendant entered into the plea agreement knowingly and voluntarily, a so-called Rule 11 colloquy. Id. 11(b).

A defendant may, even after a plea colloquy but before sentencing, withdraw his or her guilty plea. Id. 11(d)(2)(B). However, a defendant "does not have an absolute right to withdraw a guilty plea." United States v. Thompson-Riviere, 561 F.3d 345, 347 (4th Cir. 2009). A defendant must show "a fair and just reason for requesting the withdrawal," Fed. R. Crim. P. 11(d)(2)(B), and the defendant carries the burden of proving such. United States v. Moore, 931 F.2d 245, 248 (4th Cir. 1991). An evaluation of the Rule 11 colloquy is crucial in making this determination because "a properly conducted Rule 11 guilty plea colloquy leaves a defendant with a very limited basis upon which to have his plea withdrawn." Id. Other non-exhaustive factors to consider in determining whether a withdrawal of a plea is merited include

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

United States v. Bowman, 348 F.3d 408, 414 (4th Cir. 2003).

Here, defendant's Rule 11 colloquy at his arraignment was properly conducted and provides strong evidence that defendant's plea was knowing and voluntary. Further, all six Bowman factors weigh towards a finding that there is not a fair or just reason for allowing withdrawal here.

First, as already noted, the court's review of defendant's Rule 11 colloquy reveals no grounds to conclude that it was improperly conducted or that defendant's conduct during the arraignment, during which the colloquy was delivered, was not knowing and voluntary; nor has defendant affirmatively offered any evidence that his plea was not knowing or voluntary, leading

4

the court to conclude that defendant has failed to show how the first Bowman factor weighs in his favor.

As to the second and third factors, defendant has not credibly asserted his legal innocence and has rather indicated that he seeks to withdraw his guilty plea pursuant to a plea agreement to instead enter a guilty plea without a plea agreement. Further, it is without question that there has been a delay between the entering of the plea and the filing of this motion of over a year.

In addition, the final three Bowman factors weigh against defendant's motion. Defendant has not explicitly indicated, nor has the court's review revealed, any manner in which his previous counsel, who represented defendant at the time he entered the plea deal, failed to perform his duties "to an objective standard of reasonableness." See Bowman, 348 F.3d at 416 (internal quotations omitted) (explaining that this factor is analyzed under the traditional standard for ineffective assistance of component counsel). Finally, grant of defendant's motion would result in prejudice to the government, who would lose the "benefit of the bargain" it struck with defendant, United States v. Lewis, 633 F.3d 262, 269 (4th Cir. 2011), and would waste judicial resources to enter what is the functional equivalent of the same plea and perhaps even more prejudicial to defendant than his original plea agreement.

Finally, the court notes that its grant of defendant's uncontested oral motion to amend the portion of the plea agreement relating to cooperation moots the portion of defendant's motion predicated on his objection to the inclusion of a "cooperation agreement."

B.  Defendant's Objection to Career Offender Status

As noted above, defendant objected to the portion of PSR that noted that he was a career offender, premising his objection on his second-degree murder conviction under North Carolina law being counted as a predicate conviction.[3]

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a). A crime of violence "means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or . . . (2) is murder, voluntary manslaughter," or a number of other enumerated crimes not pertinent here. Id. § 4B1.2(a). Hereinafter, the court refers to subsection (1) of this definition as the "use of force" provision, and subsection (2) as the "enumerated offense" provision.

"When addressing whether a prior conviction triggers a Guideline sentencing enhancement, '[courts] approach the issue categorically, looking only to the fact of conviction and the statutory definition of the prior offense.'" United States v. Dozier, 848 F.3d 180, 183 (4th Cir. 2017) (quoting United States v. Cabrera–Umanzor, 728 F.3d 347, 350 (4th Cir. 2013)).[4] This means that "[t]he categorical approach focuses on the elements of the prior offense rather than the conduct underlying the conviction." Id. (alteration in original) (internal quotation marks omitted) (quoting Cabrera-Umanzor, 728 F.3d at 350). "[I]f the offense can be committed without

---

[3]   Defendant "does not raise an issue with his prior drug conviction" being counted as a predicate offense for career offender status, (Sentencing Mem. (DE 58) 2), and therefore it is not discussed further.

[4]   In this analysis, the court may rely on precedents evaluating the Armed Career Criminal Act's definition of a "violent felony" as well as cases decided on Guidelines "crime of violence" bases because the two terms are "defined in a substantively identical manner." United States v. Simmons, 917 F.3d 312, 318 (4th Cir. 2019) (internal quotations omitted), as amended (Mar. 6, 2019).

6

satisfying the definition of crime of violence, then it is overbroad and not a categorical match." United States v. Simmons, 917 F.3d 312, 316 (4th Cir. 2019).

    1.    Use of Force Clause

The court must "review the elements of the offense and 'the minimum conduct necessary for a violation' as defined by state law." United States v. Hammond, 912 F.3d 658, 661 (4th Cir. 2019) (quoting United States v. Gardner, 823 F.3d 793, 802 (4th Cir. 2016)). Under categorical approach, "the state crime necessarily must have as an element the 'use, attempted use, or threatened use of physical force against the person of another' to qualify as a crime of violence under the force clause." Id. (quoting U.S.S.G. § 4B1.2(a)(1)). "Physical force" means "violent force—that is, force capable of causing physical pain or injury to another person." Johnson v. United States, 559 U.S. 133, 140 (2010). Further, "use" of force requires intent on the part of the actor above negligence, Leocal v. Ashcroft, 543 U.S. 1, 9 (2004), and requires at least some mental state on the part of the actor, Begay v. United States, 553 U.S. 137, 145-46 (2008). However, use of force "does not demand that the person applying force have the purpose or practical certainty that it will cause harm, as compared with the understanding that it is substantially likely to do so," meaning that an actor uses force, within the meaning of crime of violence, "whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct, Voisine v. United States, 136 S. Ct. 2272, 2279 (2016).

In at least three unpublished opinions, the United States Court of Appeals for the Fourth Circuit has held, relying on § 4B1.2(a)(1)'s use of force clause, that "because North Carolina second-degree murder requires the unlawful killing of a human being, . . . [it] qualifies as a crime of violence. United States v. Parrish, 767 F. App'x 440, 443 (4th Cir.) (per curiam), cert. denied, 140 S. Ct. 204 (2019); United States v. Bell, 704 F. App'x 297, 298 (4th Cir. 2017) (per curiam);

7

United States v. Lee, 697 F. App'x 175, 176 (4th Cir. 2017) (per curiam). However, "[b]ecause unpublished decisions may constitute persuasive, but not binding, authority," the court must "independently examine the [state] statutes." Hammond, 912 F.3d at 662.

In 1997, the year of defendant's relevant conviction, North Carolina's "murder in the first and second degree" statute did not explicitly define second degree murder, only describing it as "[a]ll other kinds of murder" than first degree murder as defined in the statute. N.C. Gen. Stat. § 14-17 (1999). Second-degree murder in North Carolina is defined by common law as announced by that state's courts, which have held that "[s]econd-degree murder is defined as 'the unlawful killing of a human being with malice but without premeditation and deliberation.'" State v. Thibodeaux, 352 N.C. 570, 582 (2000) (quoting State v. Flowers, 347 N.C. 1, 29 (1997)). Further, "the element of malice in second-degree murder is proved by intentional conduct, [and] a defendant need only intend to commit the underlying act that results in death." State v. Coble, 351 N.C. 448, 452 (2000) (emphasis added); see also State v. Wilkerson, 295 N.C. 559, 580 (1978) ("[T]he crime [of second-degree murder] does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death." (emphasis added)).

The requisite intent must be proven to be either "'express hatred, ill-will or spite'; or . . . a 'condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification,'" or, alternatively, may be shown by the "commission of inherently dangerous acts in such a reckless and wanton manner as to 'manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.'" Coble, 351 N.C. at 450-51 (quoting State v. Reynolds, 307 N.C. 184, 191 (1982)). "The distinction between 'recklessness' indicative of [second-degree] murder and 'recklessness' associated with manslaughter 'is one of degree rather than kind.'" State v. Rich, 351 N.C. 386, 393 (2000).

8

The reckless manner required for second-degree murder in North Carolina is "conduct where the actor is <u>conscious of his conduct</u>, and conscious of his knowledge of the existing conditions that injury would probably result, and that, with <u>reckless indifference to consequences</u>, the actor consciously and <u>intentionally did some wrongful act</u> to produce injurious result." <u>Id.</u> at 394-95 (emphasis added) (quoting jury instructions that the court found properly described the requisite intent in regard to the conduct and result for second-degree murder); <u>see also</u> <u>State v. Coble</u>, 351 N.C. 448, 451 (2000) ("The element of malice for second-degree murder, therefore, may be established by evidence that a person intentionally inflicted a wound that results in death" rather than a requirement "that the defendant intended for his action to result in the victim's death." (quotations omitted)); <u>State v. Ray</u>, 299 N.C. 151, 158 (1980) ("In connection with [second-degree murder and voluntary manslaughter], the phrase 'intentional killing' refers not to the presence of a specific intent to kill, but rather to the fact that the act which resulted in death is intentionally committed.").

Given that North Carolina second-degree murder categorically requires intentional conduct with a mens rea at least more culpable than negligence, which results in an unlawful killing, it accordingly requires a "use of physical force against the person of another" as required to constitute a crime of violence under U.S.S.G. § 4B1.2(a)(1). An unlawful killing that was done without the requisite minimum intent for second-degree murder in North Carolina would also not qualify as the kind of use of force required to constitute crime of violence. Accordingly, the "minimum conduct necessary" for second-degree murder in North Carolina categorically includes the "use . . . of physical force against the person of another [required] to qualify as a crime of violence under the force clause." <u>Hammond</u>, 912 F.3d at 661 (quotations omitted); <u>see</u> <u>In re Irby</u>, 858 F.3d 231, 236 (4th Cir. 2017) (holding that the federal offense of "second-degree retaliatory

9

murder is a crime of violence under the force clause because unlawfully killing another human being requires the use of force 'capable of causing physical pain or injury to another person.'" (quoting United States v. Luskin, 926 F.2d 372, 379 (4th Cir. 1991))). See generally Johnson, 559 U.S. at 140–41 (citing with approval the definition of a "'violent felony' as '[a] crime characterized by extreme physical force, such as murder, forcible rape, and assault and battery with a dangerous weapon" (emphasis added) (alteration in original) (quoting Violent Felony, Black's Law Dictionary (9th ed. 2009))).

Defendant argues that the Supreme Court's decision in Leocal precludes North Carolina second-degree murder from U.S.S.G. § 4B1.2's definition of a crime of violence because the Supreme Court, in that case, held that the defendant's conviction for DUI causing serious bodily injury did not constitute a "crime of violence" under 18 U.S.C. § 16. 543 U.S. at 3-4. In that case, the relevant statutory section defined a crime of violence as including "as an element the use, attempted use, or threatened use of physical force against the person or property of another." Id. 543 U.S. at 8 (internal quotation marks omitted) (quoting 18 U.S.C. §16). The Court found that because the relevant state statute did not contain a mens rea requirement, it did not meet § 16(a)'s requirement of use of force, which "most naturally suggests a higher degree of intent than negligent or merely accidental conduct" such as "stumbling and falling into" another person. Id. at 9.[5]

Defendant argues that, accordingly, because "North Carolina second-degree murder can be committed recklessly," it cannot be a crime of violence, which requires use of force per U.S.S.G. § 4B1.2(a)(1). Defendant's argument confuses the mens rea required for conduct and the mens

---

[5] Defendant additionally relies on Begay, which similarly held that a run-of-the-mill DUI offense does not constitute a crime of violence because it does "not insist on purposeful, violent, and aggressive conduct" and is "most nearly comparable to . . . crimes that impose strict liability, criminalizing conduct in respect to which the offender need not have had any criminal intent at all." 553 U.S. at 144-46, 148, abrogated on other grounds by Johnson, 576 U.S. 591.

10

rea required for the <u>result</u> of an individual's conduct. North Carolina second-degree murder would not cover intentional conduct that resulted in a negligent result, see, e.g., <u>Rich</u>, 351 N.C. at 393, or unintentional conduct that resulted in an unintentional result, both of which the Court considered in <u>Leocal</u>. 543 U.S. at 9 (describing the necessity for "a higher degree of intent than <u>negligent</u> or <u>merely accidental conduct</u>," like "stumbling and falling," to find a use of force (emphasis added)). North Carolina's mens rea requirement for second-degree murder of at least criminal recklessness and intentional conduct removes it from the realm of conduct discussed by the Supreme Court in <u>Leocal</u>.

For the foregoing reasons, defendant's conviction for second-degree murder is a conviction for a crime of violence within the meaning of U.S.S.G. § 4B1.2(a)(1) and can count towards his status as a career offender under U.S.S.G. § 4B1.1(a).

2. Enumerated Offenses Clause

In addition, defendant's second-degree murder conviction constitutes a conviction for "murder," an enumerated offense under U.S.S.G. § 4B1.2(a)(2).

"In applying the categorical approach to determine if an offense falls within the scope of the enumerated offenses clause," the court must follow "a 'well-established procedure.'" <u>Simmons</u>, 917 F.3d at 317. First, rather than look to "the [crime's] common law meaning," the court must examine the "'generic, contemporary meaning' of the crime, which will typically correspond to the 'sense in which the term is now used in the criminal code of most states.'" <u>United States v. McCollum</u>, 885 F.3d 300, 304 (4th Cir. 2018) (quoting <u>Taylor v. United States</u>, 495 U.S. 575, 598 (1990)). "The generic definition may be gleaned from the Model Penal Code, modern criminal law textbooks, or from a survey of the states' definitions of the crime." <u>Simmons</u>, 917 F.3d at 317. After this definition is determined, the court must analyze "whether the elements

11

of the prior conviction . . . categorically match the elements of the generic offense." Id. The elements of the prior conviction and the elements of the generic offense categorically match "if the least culpable conduct punished by the state criminal statute falls within the scope of the generic offense." Id. at 317.

Murder, as used in the current Guidelines enumerated offense clause, is undefined and was only added in August 2016, see U.S.S.G. app. C amend. 798. The Model Penal Code, which does not classify murder by degree, defines murder as "criminal homicide" that "is committed purposely or knowingly" or that is "committed recklessly under circumstances manifesting extreme indifference to the value of human life," M.P.C. § 210.2(1), but defines as separate offenses manslaughter and negligent homicide, id. §§ 210.3-.4. Wayne LaFave's Substantive Criminal Law defines second-degree murder, in the modern sense, as generally including "intent-to-kill murder without the added ingredients of premeditation and deliberation" and "depraved-heart murder." LaFave, Substantive Criminal Law § 14.7(e), Westlaw (database updated Oct. 2020).[6] It defines "intent-to-kill murder" as "[c]onduct, accompanied by an intent to kill, which is the legal cause of another's death," and "depraved heart murder" as

> [e]xtremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another.

Id. § 14.1. In sum, the generic, contemporary definition of murder includes conduct that causes the death of another that is accompanied by either the purpose or knowledge that the conduct will kill another or reckless disregard to the high risk that another may be killed.

---

[6] LaFave's definition of second-degree murder includes "intent-to-do-serious-bodily-injury murder," LaFave, Substantive Criminal Law § 14.7(e), Westlaw, but further notes that "most modern codes define murder as not including the intent-to-do-serious-bodily-injury type," id. § 14.3.

As discussed above, second-degree murder in North Carolina is "the unlawful killing of a human being with malice but without premeditation and deliberation." Flowers, 347 N.C. at 29. It requires "intentional conduct" done with one of three requisite mental states. Coble, 351 N.C. at 450-52. The conduct must be done with either "express hatred, ill-will or spite" or the "condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification," or the conduct must be the "commission of inherently dangerous acts in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." Id. at 450-51 (quotations omitted).

Under the generic offense's category of "murder with intent to kill," it categorically matches North Carolina's definition of a second-degree murder based on "express hatred" or intentionally taking the life of another without justification or excuse, see Coble, 351 N.C. at 450-51. The generic offense further includes the categorical equivalent of North Carolina's second-degree murder via reckless or wanton conduct with disregard for human life, see id., under the generic offense's category of depraved heart murder. The "least-culpable conduct" punished by North Carolina's second-degree murder offense would be intentional conduct, undertaken with reckless indifference to the danger to human life, that results in another's death, see Rich, 351 N.C. at 394-95, which falls within the scope of generic second-degree murder's category of "depraved heart murder." Accordingly, the elements of defendant's second-degree murder conviction "categorically match" the elements of the generic offense of second-degree murder or non-premediated murder. See Simmons, 917 F.3d at 317. Because of this categorical match, defendant's conviction for the offense of second-degree murder falls within the scope of the enumerated offense clause's use of the term "murder."

In sum, under either the use of force clause or the enumerated offense clause, defendant's conviction for second-degree murder in 1998 constitutes a conviction for a crime of violence. Because defendant has a conviction for a crime of violence, from 1998, and a conviction for a controlled substance offense, in 2015, defendant meets the Guidelines definition for a career offender.[7]

C.  Defendant's Pro-Se Objection to Specific Offense Characteristic

As noted above, defendant orally objected, pro-se, to the presentence report's determination that he "maintained a premises for the purpose of manufacturing or distributing a controlled substance," U.S.S.G. 2D1.1(b)(12), which resulted in a two-level increase to his offense level.

A two-level increase applies "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Id. § 2D1.1(b)(12). The commentary on the application of subsection (b)(12) explains that among the factors to be considered are "whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises" and that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises." Id. § 2B1.1 cmt. n.17.

---

[7]  Of final note, defendant's common law robbery convictions could not be used to support a career offender determination because they occurred outside the permitted time limit. Defendant commenced the instant offenses in December of 2017. Defendant's two convictions for common law robbery occurred in September and October of 1995, more than fifteen years from defendant's relevant conduct for the instant offense, and defendant's sentence imposed for those convictions, December 1995 to March 1997, does not fall within the fifteen-year period going back from defendant's 2017 offenses. See U.S.S.G. § 4A1.2. However, the probation office did not rely on these convictions for its determination that defendant was a career offender, and neither does this court.

The presentencing report reveals that trash at defendant's home contained "plastic baggies with the corners torn or cut off typical with narcotics packaging" and "small white flakes which field tested positive for cocaine." Further, over $11,000, multiple counterfeit bills, drug paraphernalia, .75 grams of cocaine base ("crack"), and two safes with evidence of drug storage and drug transactions were also discovered at defendant's home. "Drug storage on the property and transactions on the property will usually suffice [to establish primary use]." United States v. Messer, 655 F. App'x 956, 958 (4th Cir. 2016) (alteration in original) (quoting United States v. Bell, 766 F.3d 634, 638 (6th Cir. 2014)). Accordingly, a subsection (b)(12) enhancement was appropriate in this instance.

## CONCLUSION

For the reasons stated herein, the court DENIED defendant's motion to withdraw his plea agreement, GRANTED defendant's motion to amend his plea agreement, and OVERRULED defendant's two objections to the presentencing report.

SO ORDERED, this the 14th day of October, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge